ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

JUL 1 0 2012

ATLANTA DIVISION

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL INDICTMENT |
| | : | No. |
| v. | : | |
| | : | **UNDER SEAL** |
| KEYVAN KESHAVARZI, | : | |
| ERDAL AKOVA, | : | 1 12-CR-220 |
| MURAD TUNCAY, | : | |
| ESA KIMYA METAL | : | |
|     SAN VE TIC. LTD, and | : | |
| UTIA CHEM COMPANY | : | |

THE GRAND JURY CHARGES:

## COUNT ONE

### INTRODUCTION

At all times relevant to this indictment,

1.   Defendant UTIA CHEM COMPANY ("UTIACHEM") was an Iranian company based in the Islamic Republic of Iran ("Iran"), and was in the business of, among other things, supplying to Iran composite and reinforcement materials, to include Magnobond 6398 A/B epoxy.

2.   Magnobond 6398 A/B was an epoxy used, among other purposes, to repair damaged rotor blades on civilian and military Bell helicopters.  Magnobond 6398 A/B epoxy was specifically sought out world wide for these purposes due to its high quality

1

and performance in bonding metals and composite structures. Although a few other companies make a similar epoxy, Magnobond 6398 A/B commonly was requested by companies owned or controlled by the Iranian government for use in the repair of the numerous Bell helicopters acquired prior to the Iranian Islamic Revolution in 1979. Magnobond 6398 A/B was a "United States origin good," meaning that it was manufactured in the United States, specifically, the Northern District of Georgia.

3.   Defendant Keyvan KESHAVARZI ("KESHAVARZI") was an Iranian national living in Iran and employed with Defendant UTIACHEM. Defendant KESHAVARZI listed his title in electronic mail correspondences as the Direct Manager for the company.

4.   One of UTIACHEM's customers was the Iran Aircraft Manufacturing Industrial Company, also known as HESA, and also known as Iran Aircraft Industries. HESA, which was established in 1976 as part of the Iranian Aviation Industries Organization ("IAIO"), was owned and controlled by Iran's Ministry of Defense and Arms Forces Logistics ("MODAFL").

5.   By notice made public through the Federal Register on December 19, 2007, the U.S. Department of State, in consultation with the Department of Treasury and the Department of Justice, designated MODAFL as a Weapons of Mass Destruction proliferator or supporter after determining that it "engaged, or attempted to

engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery." 72 Fed. Reg. 71991-02 (December 19, 2007). Pursuant to Executive Order 13382, made public through Federal Register Notice on October 28, 2008, the U.S. Department of Treasury similarly designated the Iran Aircraft Manufacturing Industrial Company, also known as HESA, as a Weapons of Mass Destruction proliferator or supporter because it was owned or controlled by MODAFL. 73 Fed. Reg. 64008-01 (October 28, 2008).

6.   Defendant ESA KIMYA METAL SAN VE TIC LTD ("ESA KIMYA") was a Turkish company based in Istanbul, Republic of Turkey ("Turkey"), and was in the business of, among other things, manufacturing composite parts and profiles from fiber composites. The company allowed UTIACHEM to list ESA KIMYA's name on invoices as the purchaser for epoxy originating in the United States that was destined for delivery to Iran. ESA KIMYA also acted as the transshipper of various epoxies, including the Magnobond 6398 A/B epoxy, for ultimate delivery and use in Iran.

7.   Defendant Erdal AKOVA ("AKOVA") resided in Turkey and was 50% owner of Defendant ESA KIMYA. His title in the company was Board Member and Chemical Engineer.

3

8.   Defendant Murad TUNCAY ("TUNCAY") resided in Turkey and was employed with Defendant ESA KIMYA.

<u>THE LAW AND REGULATIONS</u>

<u>INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT ("IEEPA")</u>

9.   At all times relevant to this Indictment, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 - 1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declared a national emergency with respect to that threat.

10.   On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Order No. 12959 (issued on May 6, 1995) and Executive Order No. 13059 (issued on August 19, 1997), was in effect at all times relevant to this Indictment pursuant to the publication of the Notice of Continuation of the National Emergency With Respect to Iran.   <u>See</u> 73 Fed. Reg. 13727 (March

4

11, 2008), 74 Fed. Reg. 10999 (March 11, 2009), 75 Fed. Reg. 12117 (March 10, 2010), and 76 Fed. Reg. 13283 (March 8, 2011).

11. Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, sale, or supply, directly or indirectly, to Iran of any goods from the United States. The Executive Orders also prohibited any transaction within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

12. The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

13. The Iranian Transactions Regulations prohibited, among other things, the export, sale, or supply, directly or indirectly, of any goods from the United States to Iran or the Government of Iran, without prior authorization or license from

the United States Department of the Treasury, through the Office of Foreign Assets Control. These regulations further prohibited any transactions that evade or avoid, or have the purpose of evading or avoiding, any of the prohibitions contained in the Iranian Transactions Regulations, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

14. The Executive Orders and the Iranian Transactions Regulations were in effect at all times relevant to this Indictment.

15. Therefore, the Magnobond 6398 A/B epoxy cannot be exported directly or indirectly to Iran without first obtaining a license to export or authorization from the Office of Foreign Assets Control.

16. At no time did the defendants, KEYVAN KESHAVARZI, ERDAL AKOVA, MURAD TUNCAY, ESA KIMYA, and UTIA CHEM COMPANY, apply for, receive, or possess a license or authorization from the Office of Foreign Assets Control to export goods, technology, or services, of any description, to Iran.

<u>THE CONSPIRACY</u>

17. From February 2009 continuing through on or about the date of this Indictment in the Northern District of Georgia, and elsewhere, the defendants, KEYVAN KESHAVARZI, ERDAL AKOVA, MURAD

TUNCAY, ESA KIMYA, and UTIACHEM, did knowingly and willfully combine, conspire, confederate and agree together, with each other and others known and unknown to the grand jury, to commit the following offenses against the United States: to knowingly and willfully export and cause to be exported Magnobond 6398 A/B epoxy from the United States to Iran, without first having obtained from the U.S. Department of the Treasury's Office of Foreign Assets Control a license for such export or written authorization for such export, in violation of the International Emergency Economic Powers Act, 50 U.S.C. § 1705, and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

<u>MANNER AND MEANS</u>

18.   The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a.   At all times relevant to this Indictment and on behalf of persons in Iran, ESA KIMYA acted as the purchaser and transshipper of Magnobond 6398 A/B.   ESA KIMYA, through its employees, MURAD TUNCAY and ERDAL AKOVA, facilitated the placement of orders by KEYVAN KESHAVARZI for epoxy manufactured in the United States and purchased on behalf of Iranian entities for delivery in Iran.   The orders were placed, in part, through the use of electronic mail and telephone calls.   ESA KIMYA paid

for the orders through international monetary wire transfers. Once the product was delivered to Turkey, ESA KIMYA arranged for the eventual transshipment of the items to Iran.

b.    At all times relevant to this Indictment, UTIACHEM through its employees, KEYVAN KESHAVARZI and at least one other employee, used electronic mail and telephone calls to place orders from Iran to the United States and elsewhere for the purchase of Magnobond 6398 A/B epoxy, which is a United States origin good.   UTIACHEM then paid for the items by wiring funds through ESA KIMYA's bank account(s), located in Turkey. Employees of UTIACHEM and ESA KIMYA then arranged for the items to be shipped to ESA KIMYA in Turkey, which then arranged to ship the items to Iran.   After the items were delivered to Iran, UTIACHEM and its employees arranged for the final delivery to its customers, including HESA.

<u>OVERT ACTS</u>

19.   To further the objectives of the conspiracy, and to accomplish its goals, the following overt acts, among others, were committed in the Northern District of Georgia and elsewhere:

(a)   On or about February 15, 2009, defendant UTIACHEM received a request to submit to HESA a best offer to provide HESA with 400kg of Magnobond 6398.

(b)   On or about March 13, 2009, defendant KESHAVARZI

replied to the request by sending to HESA a Pro Forma invoice which contained defendant KESHAVARZI's quote to sell to HESA Industries 467kg of Magnobond 6398 A/B (371 kilograms, or 100 gallons, of type A; and 96 kilograms, 40 gallons, of type B). The invoice listed the origin of the goods as "USA," the seller was listed as "UTIA CHEM Co." in Iran, and the buyer was listed as HESA Industries.

(c) On or about April 12, 2009, defendant KESHAVARZI contacted a company located in Ontario, Canada ("Canadian Company"). Defendant KESHAVARZI advised that he and his company were located in Tehran, Iran, and that he was interested in purchasing 467 kilograms of Magnobond 6398 (371 kilograms, or 100 gallons, of type A; and 96 kilograms, 40 gallons, of type B). Defendant KESHAVARZI asked for the price of CIF (Cost, Insurance and Freight) to Iran, or to the United Arab Emirates if the Canadian Company was unable to send the material to Iran.

(d) On or about April 13, 2009, the Canadian Company advised defendant KESHAVARZI that it would have to ship the product to the Dubai, United Arab Emirates.

(e) On or about April 13, 2009, the Canadian Company contacted the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia and requested a price quote for 467kgs of Magnobond 6398 A/B epoxy.

9

(f)   On or about April 13, 2009, the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia provided the price quote to the Canadian Company.

(g)   On or about May 5, 2009, defendant KESHAVARZI requested the Canadian Company to send the offer.   Defendant KESHAVARZI identified UTIACHEM as the company name for the offer along with the company's address in Tehran, Iran.

(h)   On or about May 5, 2009, the Canadian Company sent an email to defendant UTIACHEM advising that the Canadian Company was working on obtaining a quote.   Attached to the email was a data sheet for the Magnobond 6398 epoxy.   The data sheet listed the name of the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia.

(I)   On or about May 6, 2009, the Canadian Company contacted defendant KESHAVARZI and informed defendant KESHAVARZI that the epoxy came in pre-set weight kits.   The Canadian Company further advised that the cost of the pre-assembled kit of 477kgs of Magnobond 6398 A/B would cost $53,440 U.S. dollars.

(j)   On or about May 12, 2009, the purchasing department of HESA contacted defendant KESHAVARZI and asked that the original order of Magnobond 6398 be split into two orders: one order of 200kgs for immediate delivery and the second order for 277kgs for delivery in six to eight months.

(k)   On or about May 17, 2009, defendant KESHAVARZI contacted the Canadian Company to advise that the purchaser of the Magnobond 6398 A/B epoxy requested that the material be provided in two separate purchase invoices: one purchase invoice reflecting a quantity of 200kgs with delivery in one month, and the second purchase invoice with the remaining quantity of 277kgs with delivery in four to five months.

(l)   On or about May 18, 2009, the Canadian Company contacted defendant KESHAVARZI and advised that the Magnobond 6398 A/B epoxy was sold by the kit.  The Canadian Company further advised that the order could be split and that the first shipment would contain 10 kits (227kgs) of the epoxy.  The second shipment would contain 11 kits (250kgs) and would be scheduled for shipment four to five months later.

(m)   On or about May 21, 2009, defendant KESHAVARZI contacted the Canadian Company and stated that the order must be shipped to Iran because the Iranian customer confirmed the offer with the delivery to Iran.

(n)   On or about May 21, 2009, the Canadian Company informed defendant KESHAVARZI that freight carriers will not deliver to Iran.  The Canadian Company further advised that they could ship to Dubai or not at all.

(o)   On or about July 9, 2009, defendant KESHAVARZI

11

contacted the Canadian Company to request that the shipment be sent to Turkey and that the Canadian Company would need to send an offer for two shipments to Turkey.

(p)  On or about July 22, 2009, defendant KESHAVARZI contacted the Canadian Company and provided the Canadian Company with the name and address of the company in Turkey that would receive the shipment of the Magnobond 6398 A/B epoxy.  The company was ESA KIMYA Ltd.

(q)  On or about July 22, 2009, the Canadian Company sent defendant KESHAVARZI an Invoice providing for the shipment of the Magnobond 6398 to ESA KIMYA Ltd, Istanbul, Turkey.

(r)  On or about August 4, 2009, the Canadian Company emailed to the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia a purchase order form for 10 kits (227kgs) of Magnobond 6398 A/B epoxy.

(s)  On or about August 4, 2009, the Canadian Company advised defendant KESHAVARZI that the Canadian Company received funds from defendant KESHAVARZI and that the order was placed.

(t)  On or about August 13, 2009, the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia prepared an invoice to the Canadian Company for the epoxy.  On or about that same date, the manufacturer shipped the Magnobond 6398 epoxy from the Northern District of Georgia to the

Canadian Company in Ontario, Canada.

(u) On or about September 1, 2009, the Canadian Company requested confirmation that Erdal AKOVA was the contact person for the shipping address of "ESA KIMYA LTD STI., Dilovasi OSB 4015 Street No. 6, Gebze Kocaeli, Turkey, 41400."

(v) On or about September 2, 2009, defendant KESHAVARZI contacted defendant AKOVA and asked defendant AKOVA to confirm ESA KIMYA's shipping address for the "Magnobond order."

(w) On or about September 3, 2009, defendant KESHAVARZI sent an email directly to the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia, in which defendant KESHAVARZI advised that his name was Erdal and that he was in Turkey. Defendant KESHAVARZI further listed the company ESA KIMYA LTD in the signature block. Defendant KESHAVARZI requested price quotes for different items.

(x) On or about November 10, 2009, defendant AKOVA, employed by ESA KIMYA, informed an employee of UTIACHEM that the Magnobond 6398 A/B shipment arrived from Canada.

(y) On or about November 18, 2009, defendant AKOVA contacted defendant KESHAVARZI and advised that ESA KIMYA received the documents for the Magnobond 6398 order and that the goods cleared customs. Defendant AKOVA asked defendant

KESHAVARZI to provide the name and address of the company in Iran for the invoice.

(z) On or about November 18, 2009, defendant KESHAVARZI advised defendant AKOVA that all documentation should be sent to the customer "Iran Air Craft Industries (HESA)," at "36 Shafapei Alley, Arasbaran Street, Pole Seyed Khandan, Tehran, Iran."

(aa) On or about April 27, 2010, defendant KESHAVARZI, who listed his name as Erdal Akova and listed ESA KIMYA Ltd in the signature block, contacted the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia and requested a price quote for 250kgs of Magnobond 6398 epoxy.

(bb) On or about May 26, 2010, defendant KESHAVARZI sent an email to a Department of Homeland Security undercover agent ("UC Agent"), who was posing as a representative for the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia. Defendant KESHAVARZI stated falsely that his name was Erdal Akova and that the name of his company was ESA KIMYA. Defendant KESHAVARZI advised that defendant KESHAVARZI was waiting on the purchaser to provide payment for the manufacturer's quote for 250kgs of Magnobond 6398, which was made on or about April 28, 2010, and as referenced in paragraph (aa).

14

(cc) On or about November 30, 2010, defendant KESHAVARZI informed defendant Murad TUNCAY, employed by ESA KIMYA, that defendant KESHAVARZI had placed a new order with the manufacturer of the Magnobond 6398 A/B epoxy located in the Northern District of Georgia. Defendant KESHAVARZI further advised that the Magnobond 6398 A/B would be shipped to ESA KIMYA in Turkey from the United States. Defendant KESHAVARZI requested the CIF (cost, insurance and freight) price to ship the epoxy from Turkey to Iran. Defendant KESHAVARZI further provided defendant TUNCAY with a Pro Forma Invoice from the manufacturer of the Magnobond 6398 A/B epoxy. The Pro Forma Invoice listed the consignee for Magnobond 6398 A/B as Erdal AKOVA, ESA Kimya Co., Istanbul, Turkey. The estimated total cost was $8051.14.

(dd) On or about November 30, 2010, defendant TUNCAY replied to the request referred to in paragraph (cc) by providing a cost which totaled $13,750.

(ee) On or about December 22, 2010, HESA contacted defendant UTIACHEM and requested an updated pricing for 250kgs of Magnobond 6398 A/B.

(ff) On or about December 27, 2010, defendant KESHAVARZI requested defendant TUNCAY to provide another Pro Forma invoice for same Magnobond order as referenced in paragraph (cc). Defendant KESHAVARZI advised that the price should include

15

the cost of the Magnobond 6398 and the cost of a test report. Defendant KESHAVARZI further requested that the description of the Magnobond be listed as glass fiber.

(gg) On or about January 5, 2011, defendant KESHAVARZI sent to ESA KIMYA a bank funds transfer document showing a payment from defendant KESHAVARZI's bank account in Iran to ESA KIMYA's bank account in Turkey.

(hh) On or about December 29 2010, defendant TUNCAY provided the UC Agent with a bank funds transfer document showing a transfer from ESA KIMYA's bank account in Turkey to a bank account in Atlanta, Georgia, for the Magnobond order.

(ii) On or about March 30, 2011, defendant KESHAVARZI forwarded to defendant TUNCAY an email from the UC Agent regarding the status of their order of Magnobond 6398 epoxy and inquiring about whether defendant KESHAVARZI represented a particular company that was located in Iran.

(jj) On or about April 4, 2011, defendant KESHAVARZI asked defendant TUNCAY to contact the UC Agent regarding the Magnobond 6398 order. Defendant KESHAVARZI further advised that defendant KESHAVARZI's customer needed the order "urgently."

(kk) On or about April 4, 2011, and in response to the comment by the UC Agent in regards to dealing with companies in Iran, defendant TUNCAY expressed concern to an employee of

16

UTIACHEM that defendant KESHAVARZI's name was "everywhere" on email communications that were sent to the UC Agent, which were presented as communications supposedly from defendant AKOVA.

(ll) On or about April 4, 2011, defendant KESHAVARZI informed defendant TUNCAY that defendant KESHAVARZI's name was only in the "from" line of all the emails to the UC Agent and that all the emails used defendant AKOVA's name.   Defendant KESHAVARZI directed defendant TUNCAY to inform the UC Agent that defendant KESHAVARZI's email account was no longer active and that their business was only in Turkey.   Defendant KESHAVARZI further directed defendant TUNCAY to tell the UC Agent that defendant AKOVA was their manager, that all emails were from defendant AKOVA, and that defendant KESHAVARZI was no longer in the company.

(mm) On or about April 29, 2011, defendant TUNCAY contacted defendant KESHAVARZI and asked defendant KESHAVARZI not to contact suppliers directly in ESA KIMYA's name. Defendant TUNCAY stated that this placed ESA KIMYA in a bad position. Defendant TUNCAY referred to the situation with the UC Agent as one of the examples.   Defendant TUNCAY further advised that defendant KESHAVARZI's actions could make it hard for all of them to get goods and to get them on time. Defendant TUNCAY warned that there was no other ESA KIMYA that could get goods on behalf

17

of defendant KESHAVARZI if ESA KIMYA was placed on a "black list."

(nn) On or about May 23, 2011, defendant KESHAVARZI informed defendant TUNCAY that the UC Agent inquired whether defendant KESHAVARZI received the test certificates for the Magnobond 6398 which were sent to defendant TUNCAY.

(oo) On or about May 23, 2011, defendant TUNCAY contacted defendant KESHAVARZI to inform him that the test certificates were received and defendant TUNCAY directed defendant KESHAVARZI not to respond to the UC Agent.

(pp) On or about June 3, 2011, defendant TUNCAY contacted defendant KESHAVARZI and requested defendant KESHAVARZI's full name so that defendant TUNCAY could sign the end-user statement on defendant KESHAVARZI'S behalf.

(qq) On or about June 4, 2011, defendant KESHAVARZI informed defendant TUNCAY that defendant KESHAVARZI's full name was Keyvan KESHAVARZI.

(rr) On or about June 6, 2011, the UC Agent received the end-user statement from defendant TUNCAY which contained signatures for Keyvan KESHAVARZI, Murad TUNCAY, and Erdal AKOVA. The end-user statement falsely listed ESA KIMYA in Turkey as the ultimate end-user of the Magnobond 6398.

18

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

20. Paragraphs 1 through 16, and 19 are hereby re-alleged and incorporated as though fully stated herein.

21. Between on or about April 1, 2010, and on or about June 30, 2011, within the Northern District of Georgia and elsewhere, the defendants, KEYVAN KESHAVARZI, UTIACHEM, ERDAL AKOVA, MURAD TUNCAY, and ESA KIMYA aided and abetted by each other, and by others known and unknown to the grand jury, did knowingly and willfully attempt to export and attempt to cause to be exported from the United States certain U.S. origin goods, that being Magnobond 6398 A/B epoxy, to the Islamic Republic of Iran through the Republic of Turkey without first having obtained the required license and authorization from the United States Department of the Treasury's Office of Foreign Assets Control, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.204; and Title 18, United States Code, Section 2.

## COUNT THREE

22. Paragraphs 1 through 16, and 19 are hereby re-alleged and incorporated as though fully stated herein.

19

23.   On or about December 29, 2010, in the Northern District of Georgia and elsewhere, the defendants, KEYVAN KESHAVARZI, MURAD TUNCAY, and ESA KIMYA, aided and abetted by each other, and by others known and unknown to the grand jury, did transmit and transfer funds from a place outside the United States to a place in the United States, that is, the defendants caused the transfer of U.S. currency from Republic of Turkey to the State of Georgia, with the intent to promote the carrying on of specified unlawful activities, that being a violation of the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1702 and 1705(c), all in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## FORFEITURE PROVISION

24.   Upon conviction of the offenses alleged in Counts One, Two, or Three of this Indictment, the defendants, KEYVAN KESHAVARZI, ERDAL AKOVA, MURAD TUNCAY, ESA KIMYA, and UTIACHEM, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violation, including but not limited to the following:

(a)   A sum of money in United States currency equal to the amount of proceeds the defendants obtained as a result of the offenses for which the defendants are convicted.

25.   In addition, upon conviction of the offenses alleged in Count Four of this Indictment, the defendants, KEYVAN KESHAVARZI, MURAD TUNCAY, ESA KIMYA, and UTIACHEM shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property any and all property involved in said money laundering offenses and all property traceable to such property, including but not limited to the following:

If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

If, as a result of any act or omission of any defendant, any property subject to forfeiture:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

21

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18 United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

A _____ BILL

_____
FOREPERSON


SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

TRACIA M. KING
ASSISTANT UNITED STATES ATTORNEY
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404/581-6305 (Telephone)
404/581-6181 (Facsimile)
Georgia Bar No. 421380